PER CURIAM: In this banking dispute brought by Respondent Wachovia Bank 
to collect on an outstanding note, Appellants Winona 

THIS OPINION HAS NO 
 PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON
AS PRECEDENT IN ANY 
 PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Wachovia Bank, N.A., Respondent,
v.
Winona Grain Co., Inc., and Michael Britton, Appellants.
 
 
 

Appeal From Florence County
 James E. Brogdon, Jr., Circuit Court 
 Judge

Unpublished Opinion No. 2004-UP-482   
Submitted September 15, 2004  Filed September 20, 2004 

AFFIRMED

 
 
 
Michael S. Church, of Columbia, for Appellants.
Hamilton Osborne, Jr. and James Y. Becker, for Respondent.
 
 
 

PER CURIAM:  In this banking dispute brought 
 by Respondent Wachovia Bank to collect on an outstanding note, Appellants Winona 
 Grain Company and Michael Brittonthe notes borrower and guarantor, respectivelychallenge 
 the trial courts dismissal of their counterclaim against Wachovia.  We affirm. 
 [1] 
FACTS
In late 1997, Michael Britton, the principal manager 
 of Winona Grain Company, a corporation in the business of buying and selling 
 grain, met with Darren Bouknight, a loan officer for Wachovia Bank, to acquire 
 capital for operating the business.  Through Bouknight, the bank agreed to extend 
 two lines of credit to Winona, one in the amount of $750,000.00 and the other 
 in the amount of $75,000.00.  
Wachovia secured the larger line of credit through 
 a first priority lien on Winonas South Carolina Department of Agriculture warehouse 
 grain receipts and capped the amount of credit available to 80% of the value 
 of the receipts.  To maintain this 80% margin, the loans commitment letter 
 allowed Wachovia to demand partial repayment anytime grain devaluation caused 
 the balance owed on the loan to exceed 80% of the value of the grain receipts.  
 If Wachovia made such a demand, the commitment letter gave Winona five business 
 days to bring the amounts back within the 80% margin requirement.  Though the 
 smaller line of credit had no corresponding margin requirement, Wachovia secured 
 the smaller loan through a [c]ontinuing first security interest in all non-receipted 
 grain inventory, inventory, accounts receivable, and assignment of grain trading 
 Margin Account.  
The commitment letters for both loans contained 
 cross-default clauses and established April 30, 1999 as the date when the lines 
 of credit expired.  The commitment letters also contained the following terms:

Prepayment: 
Both Notes  At your companys election, your company 
 may prepay these Loans in whole or part without penalty.
. . . .
Disbursement and Conditions:
Both Notes  Funds are to be distributed to Winona Grain 
 Co. Inc.s business checking account at Wachovia Bank, N.A.
. . . . 
The provisions of the commitment shall survive the Loan closing 
 and shall be incorporated in the Loan documents so that a default by the Borrower 
 of any such provision shall constitute a default under the Loan documents.

More than a week after agreeing to the terms of 
 the commitment letters, Winona executed a Note and Security Agreement for both 
 revolving lines of credit using the banks standard forms.  Both notes specifically 
 incorporated the terms and conditions contained in the commitment letters and 
 indicated the loans were due on demand.  The notes also included the following 
 provision:

In addition, to the extent not prohibited by law, the Borrower 
 hereby grants to the Lender a security interest in and security title to, and 
 does hereby assign, pledge, transfer and convey to Lender . . . any balance 
 or deposit accounts of the Borrower, whether such accounts be general or special, 
 or individual or multiple party, and upon all drafts, notes, or other items 
 deposited for collection or presented for payment by the Borrower with the Lender, 
 and the Lender may at any time, without demand or notice, appropriate and apply 
 any of such to the payment of any of the Obligations (except for Restricted 
 Debt), whether or not due.

In the months following execution of the 
 notes, Wachovia dispersed the requested funds from both lines of credit into 
 Winonas business checking account.  At some time in August, Bouknight telephoned 
 Britton to tell him to deposit funds into Winonas account to cover checks that 
 had been presented for payment against the account that day.  Though Britton 
 responded by making a deposit into Winonas checking account, the deposit came 
 in the form of an out-of-state check and was thus subject to Wachovias five-day 
 hold policy for out-of-state checks.  As a consequence, the checks that prompted 
 Bouknights telephone call were returned for insufficient funds.  
In October of 1998, because Winona had 
 not given the South Carolina Department of Agriculture their audited financial 
 statements, the Department withheld validation of Winonas warehouse receipts.  
 Although Winonas receipts lacked Department validation, Bouknight agreed to 
 advance funds to Winona on the grain under the trust receipts.  Thus, while 
 Winona collected the financial records required for Department validation, Wachovia 
 made advancements of $40,000.00, $15,000.00, $75,000.00, and $8,000.00, with 
 respective due dates of October 29, October 31, November 2, and November 5, 
 1998.  
On November 3, 1998, after the expiration 
 dates for the first three trust receipts passed with no repayment from Winona, 
 Wachovia applied $16,684.10 of Winonas checking account against the larger 
 line of credit.  Again on November 4, Wachovia applied an additional $21,042.06 
 of Winonas account against the larger line of credit.  Over the same two days, 
 Wachovia returned 12 checks on Winonas account unpaid.  
On November 12, 1998, the Department of Agriculture 
 validated Winonas warehouse receipts, thereby providing adequate security for 
 the larger line of credit.  Shortly thereafter, with the loan no longer under-collateralized, 
 Wachovia made advancements of $145,000.00 and $300,000.00 on the larger line 
 of credit, though Wachovia applied $45,000.00 of the advanced funds against 
 the outstanding amount on the smaller line of credit.  
Over the next two months, Wachovia returned 19 checks on 
 Winonas account for insufficient funds.  Thereafter, Wachovia brought this 
 action against Winona for claim and delivery and recovery on the notes.  Wachovia 
 also sought to recover against Britton on his personal guarantee.  Winona asserted 
 setoff as a defense and counterclaimed for wrongful dishonor of checks presented 
 for payment against Winonas checking account.  
Prior to the trial on the merits, the trial court 
 granted Wachovias motion for summary judgment on its claims against Winona 
 and Britton for the balance due on the notes in the amount of $54,916.75.  With 
 only Winonas counterclaims remaining, a trial was commenced before a jury on 
 November 18, 2002.  After Winona presented its evidence, Wachovia moved for 
 directed verdict.  After hearing argument, the trial court granted Wachovias 
 directed verdict motion as to all causes of action.  This appeal follows.
STANDARD OF REVIEW
Motions for directed verdict require the trial 
 judge to view the evidence in the light most favorable to the non-moving party.  
 This court will reverse the trial court only when there is no evidence to support 
 the ruling below. Steinke v. South Carolina Dept. of Labor, Licensing and 
 Regulation, 336 S.C. 373, 520 S.E.2d 142 (1999).  
LAW/ANALYSIS

 I.      Wrongful Dishonor

Winona contends the trial court erred in directing 
 a verdict against its counterclaim for wrongful dishonor because the loan agreement 
 with Wachovia was ambiguous and unconscionable.  We disagree.
A bank owes a general duty to each customer to 
 honor checks drawn on his or her account if the customers account has sufficient 
 funds to cover the item presented.  St. Charles Mercantile Co. v. Armour 
 & Co., 156 S.C. 397, 405, 153 S.E. 473, 477 (1930) (It was the duty 
 of the bank, when a check which properly demanded payment was presented, to 
 make payment, if the drawer had sufficient funds to meet it.).  Rather than 
 contending the companys checking account had sufficient funds to cover each 
 of the dishonored checks, Winona argues that the accounts reoccurring insufficiencies 
 were due to Wachovias improper conduct, not its own.  
Specifically, Winona argues Wachovia was required 
 to immediately credit Winonas account for all deposits, and when Wachovia placed 
 a five-day hold on the deposit of an out-of-state check for $80,000.00, Wachovia 
 wrongfully caused an insufficiency that resulted in two checks being returned 
 on August 10, 1998.  To support their position that Wachovia was bound to give 
 immediate credit for all depositsa requirement not found in the loan documentsWinona 
 contends that because Wachovia had previously given Winona immediate credit 
 on deposits, they established a course of dealing that Wachovia was bound to 
 continue.  This argument finds no support in our law.  Courts do not look to 
 the course of dealing between parties as a tool for inserting new obligations 
 among those made explicit by the terms of a written agreement.  Rather, courts 
 draw upon parties dealings only when necessary to acquire an improved understand 
 of the meaning the parties intended by using particular words or expressions 
 in a subsequent written agreement.  Thus, course of dealing evidence is used 
 to aid to contract interpretation, not to show contract augmentation.  See 
 Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 9 (4th Cir. 1971) 
 ([E]vidence of usage of trade and course of dealing should be excluded whenever 
 it cannot be reasonably construed as consistent with the terms of the contract.); 
 Wolfe v. Herlihy, 218 S.C. 90, 95, 61 S.E.2d 764, 767-68 (1950) (The 
 testimony shows that this payment was tendered in full conformity with the construction 
 placed upon the ambiguous provisions of the lease by the parties themselves 
 through their long course of dealing.).  
Ambiguities or conflicts in documents constituting 
 contract must be construed against the party who prepared the contract. Mid-Continent 
 Refrigerator Co. v. Way, 263 S.C. 101, 208 S.E.2d 31 (1974); Southern 
 Atlantic Financial Services, Inc. v. Middleton, 349 S.C. 77, 562 S.E.2d 
 482 (Ct. App. 2002).  Identical repayment provisions of both commitment letters 
 state, [b]orrower shall repay all or any part of the amount committed on such 
 dates as it may determine Winona asserts these provisions, coupled with the 
 ability to prepay without penalty, conflict with Wachovias right under the 
 notes to require payment at any time.  These two provisions, however, merely 
 allow either party to elect at any time to extinguish the debt.  No ambiguity 
 results from these terms.    
Winona also argues that 
 the court should give more weight to the typed commitment letters than to the 
 printed notes.  This rule, however, only applies when the documents create an 
 inconsistency and because the trial judge correctly found no ambiguity in the 
 documents, this argument is without merit.  See 17A Am. Jur. 2d Contracts 
 § 395 (2002).
As such, even though Wachovia had immediately credited 
 previous deposits, both parties responsibilities and obligations remained the 
 same as outlined in their written agreement. 
Winona next argues Wachovia was required to make 
 automatic advances from the lines of credit to cover overdrafts on the Winona 
 account.  If Wachovia had made such automatic advances, Winona argues, the balance 
 in the checking account would have been sufficient to cover certain checks Wachovia 
 dishonored.  Although no written agreement between Wachovia and Winona mentions 
 automatic overdraft coverage, Winona relys exclusively on Brittons own testimony 
 about an alleged oral agreement made with Bouknight.  Winonas reliance is misplaced. 
  The parol evidence rule bars the introduction of extrinsic evidence to modify 
 or contradict the terms of an integrated written agreement.  Levy v. Outdoor 
 Resorts, 304 S.C. 427, 432, 405 S.E.2d 387, 390 (1991).  As a matter of 
 substantive law, therefore, Brittons testimony cannot modify the explicit terms 
 of the parties written agreement.
Winona further argues that Wachovia wrongfully 
 dishonored two $30,000.00 checks that Winona drew on its account at Wachovia 
 Bank and then deposited into Winonas account at Pee Dee Federal Savings Bank.  
 Winona contends that although Wachovia later tendered a cashiers check to satisfy 
 the dishonored checks, the subsequent tender did not retroactively ameliorate 
 the accounts previous insufficiency.  
As the forgoing makes clear, Winona has adduced 
 no evidence to show it had sufficient funds in its account to satisfy the checks 
 dishonored by Wachovia.  Further, Winonas allegations of wrongdoing by Wachovia 
 all fail as a matter of law.  Accordingly, the trial court committed no error 
 in granting Wachovias directed verdict motion on Winonas counterclaims.  

 II.    Setoff

As its final issue on appeal, Winona argues 
 the trial court erred in granting Wachovias motion for summary judgment because 
 the defense of setoff asserted by Winona created factual issues as to the amount 
 of indebtedness owed under the notes.  We disagree.
Rather than contesting facts germane to Wachovias 
 claim, Winona, in effect, asserts that the mere existence of its counterclaim 
 allows for the possibility of a right of setoff, thereby precluding the trial 
 court from granting summary judgment.  As the trial court correctly noted, the 
 mere existence of this potential right of setoff does not create a genuine issue 
 of material fact.  With no genuine dispute as to the material facts of Wachovias 
 claim, the trial court committed no error in granting summary judgment. 
 AFFIRMED.
STILWELL, BEATTY, and SHORT, JJ., concur.

 
 [1] We decide this case without oral argument pursuant 
 to Rule 215, SCACR.