**LYON FORD, INC., Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. 71-C-347.**

United States District Court,
E. D. New York.

Dec. 17, 1971.

Pollan, Zimmer, Fishbach & Hertan by Louis C. Fieland, New York City, of counsel, for plaintiff.

Hughes, Hubbard & Reed by Otis Pratt Pearsall, John A. Donovan, John A. Golden, Gerald B. Wald, New York City, of counsel, for defendant.

## MEMORANDUM AND ORDER

JUDD, District Judge.

Defendant has moved for summary judgment.

This action was begun in the New York Supreme Court, Suffolk County, by an order to show cause and temporary ex parte injunction issued March 17, 1971 to prevent defendant (Ford) from interfering with plaintiff's operation as a Ford dealer or from granting a franchise as a Ford dealer to anyone else in the Riverhead area of Suffolk County, New York. The complaint alleged that plaintiff had written agreements with Ford to maintain a dealership in automobiles and heavy duty trucks in Riverhead and certain other portions of Suffolk County dating from 1959, and that Ford terminated these agreements capriciously and in violation of their terms on March 15, 1971 and was about to issue a dealership to an unknown third party. The complaint asked both for injunctive relief and for a declaration that the sales agreements were in full force and could not be terminated.

Ford, a Delaware corporation with its principal place of business in Michigan, removed the case to this court and moved to dissolve the temporary injunction.[1] Although plaintiff's own motion papers in the state court indicated that Ford's termination of the contract was far from capricious, this court continued the temporary injunction pending a hearing, and required a bond of $40,000, which was furnished. Ford filed an answer on April 8, 1971 including defenses of laches and unclean hands.

---

1. The court heretofore denied a motion for remand, in spite of plaintiff's assertion that it had not alleged that the amount in controversy was over $10,000. The court held that the amount in controversy could be measured by the amount of capital necessary to operate the dealership, in spite of the fact that it had been operating at a substantial loss, and that the amount might be determined from the removal petition if not set forth in the complaint. Davenport v. Proctor & Gamble Mfg. Co., 241 F.2d 511, 514 (2d Cir. 1957).

Evidentiary hearings on the motion for a preliminary injunction were held on April 13 and April 16. At the conclusion of the second day, an adjournment was taken to April 30th without completing the cross-examination of plaintiff's president, Charles L. Lyon. Mr. Lyon appeared in court on April 30th without his attorney and stated that he would have new counsel as of May 3rd. The new attorney appeared in court on May 5. The court offered him an opportunity to submit an offer of proof and directed that Charles Lyon attend for further cross-examination on May 7, 1971. No hearing was held on that date, however. Mr. Lyon was not submitted to cross-examination, and no offer of proof was submitted. The court issued a Memorandum on May 10, 1971 which summarized the evidence introduced at the hearings and stated:

> From the facts thus far adduced, the court finds no reasonable probability of plaintiff showing that it has fulfilled its obligations under the contracts, particularly in that the record thus far indicates that (1) Lyon Ford due to financial difficulties lacked sufficient net working capital to carry out and perform its dealership duties; (2) Lyon Ford failed to receive Ford Motor Company's consent prior to relocation in 1970; and (3) at the time Ford proposed to terminate the franchise, Lyon Ford was in a state of insolvency as that term is employed in the agreements.

The court therefore dissolved the temporary injunction and denied the motion for a preliminary injunction.

Lyon Ford thereafter started another action in the Supreme Court, Suffolk County, against Ford Marketing Corporation, S. J. Obringer (a vice-president of Ford Marketing), Thomas Hart and J. J. Hart & Sons, Inc. The new action was begun on June 8, 1971 by an order to show cause and another ex parte injunction directing Ford Marketing[2] to continue all agreements with plaintiff in effect. The papers were served on the defendants on June 17th, returnable June 21. The complaint was based on Sections 197 and 197–a of the New York General Business Law, McKinney's Consol.Laws, c. 20, alleging a conspiracy to substitute Hart and the Hart corporation as dealers in the Riverhead area, and sought damages of $1,500,000 for termination of the contracts in bad faith and without cause. This action was in turn removed to this court by defendants Ford Marketing and Obringer. A motion for remand was denied and the temporary injunction was dissolved by Memorandum and Order dated July 7, 1971, 337 F.Supp. 691 (71–C–738).

*Motion for Summary Judgment*

In response to defendant's detailed and documented motion for summary judgment, plaintiff filed a four-page affidavit of Charles Lyon which conceded that the sales agreements were terminated pursuant to their provisions, but asserted that issues existed as to whether the termination was "improperly motivated" and whether a reasonable opportunity had been given to cure certain defaults as provided by Section 17(c) of the agreements (both of which are identical in their substantive provisions). Mr. Lyon asserted that he had arranged for the satisfaction of all his obligations to all creditors, except disputed New York State taxes, and for the supply of additional capital. He also asserted that he secured an order from Long Island Railroad for 154 Ford trucks pursuant to a bid submitted prior to March 15, 1971, but that Ford Marketing would not honor this order even when it was submitted through another recognized Ford dealer, until all pending litigation was terminated. No copy was submitted

---

2. Ford Motor Company had assigned all its right, title and interest in the sales agreements to Ford Marketing Corporation, a wholly-owned subsidiary, on July 1, 1970. The court has heretofore ruled that Ford Marketing Corporation was not an indispensable party to this action, since the assignment of rights did not terminate Ford's obligations under the agreements.

of the bid made to Long Island Railroad or of the request for bids.

Reply affidavits indicate that the only document submitted to Ford in reference to the Long Island Railroad order was a letter from Lyon Ford to Ford in White Plains dated June 25, 1971, which stated:

> As of this date we have received an order for the sale of 151 Ford trucks to the Long Island Railroad Division of the Metropolitan Transportation Authority.

> We are hereby transmitting this order to you. We cannot use your order form because the railroad specifications require certain features which do not appear on your standard order form. These specifications should be discussed and determined by your Heavy Truck Engineer and an engineer from the Long Island Railroad.

> .   .   .   .   .   .

> We would greatly appreciate being advised as to when your engineer will be available.

Mr. Obringer replied that he would not consider the offer because Lyon Ford was no longer an authorized Ford dealer. It also appeared from the reply affidavits that Long Island Railroad required that dump truck equipment and other types of special equipment be installed on the trucks by other contractors before delivery to the railroad and that no payment would be made until delivery.

The court is satisfied that the Long Island Railroad order, if ever given, would not have cured plaintiff's existing defaults, was not made while the sales agreements were in force, and constitutes no defense to the motion for summary judgment.

■ Even if plaintiff had corrected its defaults under the contract, this would not destroy the right to terminate. Paris v. Central Chiclera, 193 F. 2d 960, 964 (5th Cir. 1952); Belser v. Mutual Life Ins. Co., 77 F.Supp. 826, 829 (E.D.S.C.1948).

A copy of a settlement agreement with Associates Discount Corporation was attached to a supplementary affidavit of Charles Lyon filed September 1, 1971. The agreement, apparently executed by Associates Discount in April 1971, provides that an indebtedness of over $1,300,000 be settled in return for installment payments of $600,000, with the final payment of $450,000 to be made on March 26, 1975. The agreement provides, however, for entry of a judgment of $1,360,154 plus interest and attorneys' fees if any installment is not paid when due. This agreement does not show any present improvement in plaintiff's financial condition which would enable it to function as a Ford dealer.

Mr. Lyon also submitted a release, described as "limited and conditional," executed by Security National Bank on June 18, 1971. This document recites that it excludes from the release a judgment, certain mortgages, an assignment of a life insurance policy, and other security interests. Again, the release represents an effort by Mr. Lyon to escape from personal bankruptcy rather than any restoration of the solvency of the plaintiff corporation.

Finally, plaintiff submitted an affidavit of an attorney who stated that he had talked with an officer of Security National Bank who told him that discussions were held "in the Fall of 1970" with J. J. Hart, Inc. concerning the purchase of plaintiff's former property. A representative of J. J. Hart, Inc. allegedly told the branch officer that "we are getting the Ford franchise." The particular officer of Security National Bank was deposed by defendant in this action on notice to plaintiff, but plaintiff did not appear at his deposition. Since Security National Bank had acquired plaintiff's former premises by referee's deed on May 6, 1970, it was natural for the bank to look for another tenant or buyer of the property. Counsel's affidavit, that Mr. Ribaudo of Security National had told him in August

of 1971 that in the fall of 1970 Mr. Hart had spoken of getting the Ford franchises, is very thin evidence to support a claim that Ford was getting rid of plaintiff in order to favor another dealer.

█ Plaintiff had time to depose both Ribaudo and Hart and cannot use third-level hearsay to oppose the motion for summary judgment. Rule 56(e) requires that affidavits on a motion for summary judgment "be made on personal knowledge" and "set forth such facts as would be admissible in evidence." Hearsay affidavits should be disregarded. Elasky v. Pennsylvania R. Co., 215 F.Supp. 25 (N.D.Ohio 1962); Willetts v. General Telephone Directory Co., 38 F. R.D. 406 (E.D.N.Y.1965). It would have made good business sense for Ford in the fall of 1970 to consider restoring its position in the Riverhead area. Ford's justification for the termination of its sales agreements with plaintiff is too clear to be defeated by this contention, even assuming that this were a material issue. *Cf.* In re Nagel, 278 F. 105, 109 (2d Cir. 1921); Kilian v. Ferrous Magnetic Corp., 245 App.Div. 298, 299, 280 N.Y.S. 909, 910 (1st Dept. 1935).

This court's Memorandum and Order of May 10, 1971 found on the evidence that plaintiff had failed in three particulars to fulfill its obligations under its sales agreements:

(1) Plaintiff was insolvent within the meaning of ¶ 17(a) (3) (ii) of the sales agreements on September 3, 1970 when Ford Marketing served notice of termination, and continued to be insolvent through the final date of termination on March 15, 1971. Prior to the time fixed for termination, in letters dated December 11, 1970 and March 12, 1971, the Ford Dealer Policy Board concluded that plaintiff's proposals for recapitalization were too vague and indefinite to justify postponement of the termination date.

(2) Lack of consent by Ford Motor to the relocation of plaintiff's dealership following the loss of its approved premises by foreclosure was also a ground for termination under ¶ 2(b) and 17(a) (1) of the sales agreements.

(3) Insufficiency of working capital constituted ground for termination by reason of the provisions of ¶¶ 2(c) and 17(a) (1) of the sales agreements, which require plaintiff to maintain "such net working capital and net worth as may be required to enable the Dealer properly and fully to carry out and perform all of the Dealer's duties, obligations and responsibilities under this agreement."

Plaintiff has shown nothing to challenge the present validity of these findings.

In addition, defendant has shown two other breaches of obligations by the plaintiff:

(a) The drastic decline in plaintiff's sales of Ford products, noted in this court's Memorandum of May 10 (pp. 4 and 5), constituted a breach of plaintiff's obligations under ¶ 2(a) (i) of the sales agreements which requires that the dealer "shall develop energetically and satisfactorily the potentiality for such sales and obtain a reasonable share thereof" as determined by reference to criteria stated in the agreements. Under any reasonable criteria, plaintiff failed to give satisfactory sales performance during 1969 or 1970.

(b) Plaintiff's failure to submit monthly financial statements is a breach of the obligation under ¶ 2(g) of the sales agreements and affords a right of termination under ¶ 17(a) (1) of the sales agreements.

Omission of reports in the months of January through April, 1970 and June through September 1970 is not a trivial matter in the light of the conditions disclosed by the reports which were actually filed for December 1969 and May 1970. The report for December 1969 disclosed an excess of current liabilities over current assets amounting to some $128,000, a net loss for the year of over $340,000, and a negative figure of over

$275,000 for net worth. The report for May 1970 showed an even larger deficit in current assets, although the claims for current assets and current liabilities were not totalled; it also showed a five months' net loss of more than $68,000 and a negative net worth of more than $154,000 in spite of the addition of $652,000 in land and improvements on the assets side. Given such precarious financial conditions, it was important to keep Ford informed of financial changes as required by the sales agreements.

None of the material facts set forth in defendants' statement of undisputed facts pursuant to General Rule 9(g) of this court have been controverted by the plaintiff. These facts, except for the argumentative headings, are adopted by this court. Plaintiff asserts there are material issues concerning its opportunity to cure any defaults and concerning defendants' motive for termination, but the court disagrees.

■ There was no evidence at the hearings and nothing in the affidavits to support the contention that plaintiff should have been given more time to cure its defaults. On the contrary, the documents show that plaintiff's financial impairment had been pointed out by defendants' representatives as early as August 1968, and that many opportunities had been given over a two-year period to provide adequate capitalization and improved sales performance, before the notice of termination was sent. Pertinent facts are set forth in the letter of E. T. Esse, Secretary of the Dealer Policy Board of Ford Motor Company, dated December 11, 1970, which is Exhibit 8 to Mr. Lyon's affidavit of March 17, 1971 in the Suffolk County Supreme Court. Considering all the developments made known to the court up to the time of the submission of these motions, it is clear that plaintiff was given more than a reasonable time to cure its defaults, and failed to do so. Moreover, insolvency is not one of the events which the agreements (¶ 17(c)) give the dealer an opportunity to cure.

■ Neither the evidence nor the affidavits create a triable issue on plaintiff's claim that the termination was "improperly motivated." The contention in the reply affidavits has already been analyzed.

It is not necessary to pass on defendant's assertion that all claims under the agreements were released by plaintiff's failure to give a written release of termination benefits.

It is therefore ordered, that defendant's motion for summary judgment be granted, the complaint be dismissed on the merits and the Clerk be directed to enter judgment for the defendant with costs.